[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 10218
The plaintiff, a corporate landowner in the Town of Old Saybrook, appeals from the decision of the defendant Inland Wetlands and Watercourses Commission of the Town of Old Saybrook, denying its application for a wetlands permit to conduct regulated activities on a parcel of land. The property consists of a 3.41-acre parcel of property containing 1.55 acres of regulated wetland, located at the intersection of Route 154 and Brenda Road, near Exit 2 of Route 9 in the Town of Old Saybrook. The proposed development of the property is the construction of a Dunkin Donuts coffee shop/restaurant with a drive-up window, parking lot, septic system, storm water drainage and associated grading and clearing. After discussion and public hearings, the Commission denied the application on December 17, 1998. Notice was duly published and this appeal ensued pursuant to Connecticut General Statutes § 22a-43, including the State of Connecticut Department of Environmental Protection, which also appeared. The parties filed briefs and the court took testimony and heard argument on May 9, 2000. For the reasons set froth in detail below, the court dismisses the appeal and sustains the action of the Commission.
 I. FACTS
On July 16, 1998, the plaintiff, Blue Point, Inc. filed its application for a wetlands permit for permission to conduct regulated activities, as above set forth, on a 3.41 acre parcel of property located at the intersection of Route 154 and Brenda Road, near Exit 2 of Route 9 in the Town of Old Saybrook.[1] About one third, or 1.55 acres, of the parcel contains a regulated wetland. This wetland is part of a very large, important wetlands system "that extends northwest to the Old Saybrook/Essex town line and south to Ingham Ponds and Chalkers Millpond. Water from this wetland system eventually drains into the Oyster River below Route 95."[2] The entire wetlands system encompasses approximately 52 acres. The regulations of the Commission provide that certain activities with one hundred (100) feet of any wetland or watercourse are "regulated."[3] The Commission had, before the date of this application, increased the regulated area from fifty (50) feet to its present size. Located within one hundred (100) feet of the wetlands in the pending application is a portion of the rear parking lot consisting of fourteen (14) paved parking spaces, (lots 21 through 33), the sanitary system, the access drive to the drive-up window, a small portion of the building as well as a portion of the sheet speader, rip rap sump and level spreader. There are no activities located within the wetland itself.
The Commission met to discuss the application at its regular meeting on CT Page 10219 five separate dates, July 16, August 20, October 15, November 19 and on December 17, 1998.[4] On July 16, it unanimously found that the activity "may have a significant impact on the wetland area."[5] The Commission then conducted a public hearing on August 20, 1998, which was for three additional dates until November 19, 1998, at which time the hearing was closed.[6]
At the public hearing, the report of the plaintiff's expert, Edward M. Pawluk of Connecticut Ecosystems, LLC, was presented.[7] The applicant also proposed a permanent conservation easement to be granted to the town, covering a fifty (50) foot strip around this wetland. This is to be maintained as a vegetated buffer. The expert testified that "The preservation of this forested buffer, hardwood buffer will adequately protect the wetland, the adjacent wetland from disturbances due to the development of the property."[8] The expert determined that there was no adverse impact from these activities upon the wetlands. In addition, an engineer presented the drainage calculations on behalf of the plaintiff to support this analysis. Between four hundred and five hundred signatures were presented in support of the application. Many area residents spoke in opposition to the proposed development of the property, making reference to its adverse impact on the wetlands. On December 17, 1998, the Commission denied the application.[9] Written notice of the denial was provided to the applicant and on December 22, 1998, notice of the Commission's action was duly published.[10]
The written reasons stated for the denial of the application are as follows and pursuant to section 10.2 of the Regulations:
 "— With regard to 10.2A: The likelihood of its negatively impacting a valuable wetland resource in the Town of Old Saybrook, specifically having to do with water quality, as well as, direct impact within 100 feet of the regulated area.
 — With regard to 10.2C: There are concerns with the relationship between the short-term and long-term impacts of the proposed regulated activity on the wetlands or watercourses and the maintenance and enhancement of long term productivity of such wetlands or watercourse.
— With regard to 10.2E: There is a potential for the destruction of the aesthetic value of the wetland, potential damage and loss of wildlife habitat, loss of, or destruction of the beneficial aquatic organisms and aquatic plants."[11]
CT Page 10220
On January 5, 1999, the plaintiff filed the present appeal, requesting that the court sustain the appeal, reverse the Commission's decision to deny the special permit and direct the Commission to issue the requested permit. The plaintiff claims that by denying the application, the Commission acted illegally, arbitrarily, and in abuse of the discretion vested in it for three reasons in that:
 (1) there was no substantial evidence to support the decision and that the Commission erred in not accepting the opinions of the plaintiff's expert witnesses;
 (2) the Commission erred in considering future potential development in the vicinity of the wetlands, and;
 (3) the notice of the Commission's decision contains insufficient specific grounds for the denial as it made no findings regarding a prudent and feasible alternative to the regulated activities being proposed.
 11. Jurisdiction
Appeals from decisions of a wetlands commission may be taken to the Superior Court. Connecticut General Statutes § 22a-43.
 "Appeals to courts from administrative agencies exist only under statutory authority . . . A statutory right of appeal may be taken advantage of only by strict compliance with the statutory provisions by which the statutory provisions by which it is created. . . . Such provisions are mandatory, and, if not complied with, the appeal is subject to dismissal . . ." (internal citations omitted). Office of Consumer Counsel v. Department of Public Utility Control, 234 Conn. 624, 640, 662 A.2d 1251 (1995).
The court therefore will first review in detail the factual basis for the exercise of its jurisdiction.
A. Timeliness and Service of Process
The record of the Commission's proceedings and the court file reflect that notice of the decision of the Commission was duly published and that CT Page 10221 the Plaintiff filed the appeal within the time specified within the statute on January 5, 2000. The court further finds that the appeal was properly served as set forth in Connecticut General Statutes §22a-43(a). The court finds that all statutory provisions concerning timeliness and service of process have been met.
B. Aggrievement
Aggrievement is an additional jurisdictional prerequisite to maintaining any wetlands appeal. "Pleading and proof that the plaintiffs are aggrieved within the meaning of the statute is a prerequisite to the trial court's jurisdiction over the subject matter of the appeal."Munhall v. Inland Wetlands Commission, 221 Conn. 50, 602 A.2d 566
(1992). "Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact." Water Pollution ControlAuthority v. Keeney, 234 Conn. 488, 493, 662 A.2d 124 (1995). There are two categories of aggrievement — statutory and classical. Cole v.Planning Zoning Commission, 30 Conn. App. 511, 514, 620 A.2d 1324
(1993).
In order to show classical aggrievement, the plaintiff must satisfy a two-part test: first, it must demonstrate a specific personal and legal interest in the subject matter of the Commission's decision; and second, it must show that the decision caused injury to that specific personal and legal interest. See Munhall v. Inland Wetlands Commission, supra, page 50; Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525,530, 525 A.2d 940 (1987). To prove aggrievement, the plaintiff introduced its certified deed to the property in question. The court finds that aggrievement pursuant to the first ground has been proven, as the plaintiff is statutorily aggrieved by virtue of its ownership of land in question. Further, the denial of the permit implicates the plaintiff's personal and legal interest in the matter.
Because the court has found that the appeal was timely served on the proper parties and that the plaintiff is statutorily aggrieved, the court determines that it has jurisdiction to hear the appeal presented.
 III. Discussion (A) No substantial Evidence in the Record to support the Commission's Decision as the Commission erred in not accepting the Plaintiff's expert's testimony.
1. Plaintiff's Claim and the Case law.
The gravemen of this claim by the plaintiff is that no expert spoke in CT Page 10222 opposition to the application and that the record does not contain substantial evidence to support the conclusion reached by the Commission to deny the application. Mr. Pawluk, the plaintiff's expert, concluded that the proposed design protected the wetland from any adverse impact. Darcy Collins, the professional engineer also testified, summarizing Mr. Pawluk's review and stated that the area generally, including the adjacent approximately fifty-two (52) acres of swamp "consists entirely of wooded swamp dominated by red maple in the overstory, with a variety of shrubs and herbaceous species in the understory."[12] She described the functions of the wetlands, which are to provide groundwater recharge for the aquifer and to provide flood control. She noted that the wetlands have the "capacity to detain and retain a significant volume of stormwater," which provides "important protection to downstream residents and structures." It also provides pollution filtration as it has a "high capacity to immobilize, convert and assimilate pollutants and nutrients washing in from its watershed." She noted that "this is a noteworthy wetland resource in the Town of Old Saybrook, due to its large size."[13]
The engineer's testimony continued to summarize and explain the expert's report and stated that "in order to minimize the potential for the discharge of floatable hydrocarbons to the wetlands, which lie in a primary aquifer recharge area, catch basins and an oil and grit separator or other appropriate technology as recommended by the Town Engineer is suggested."[14] She pointed then to the points on the application map to show where these improvements are located, indicating in total three such areas, including a sheet spreader and the filtration from the sheet flow.
No expert spoke in opposition to the application. As argued by the Plaintiff, the case law holds that a commission may not use its own knowledge and judgment on technical matters, where there is uncontroverted testimony by expert witnesses. Feinson v. ConservationCommission, 180 Conn. 421, 429 A.2d 910 (1980). Such a rule is one of due process and fairness. As noted by the court in Feinson at pages 428 and 429:
 "If an administrative agency chooses to rely on its own judgment, it has the responsibility to reveal publicly its special knowledge and experience, to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal at an appropriate stage in the administrative proceedings.
This, however, does not mean that an agency cannot use its own common sense or lay person's knowledge to consider the matter presented before CT Page 10223 them. See, e.g., Huck v. Inland Wetlands Agency, supra, as well as ManorDevelopment Corp. v. Conversation Commission, 180 Conn. 692, 433 A.2d 999
(1980). Also, non-experts may offer reliable and substantial evidence.Kaeser v. Conservation Commission, 20 Conn. App. 309, 315-316, 567 A.2d 383
(1989). As the court in Kaeser at page 314 succinctly put it:
 "We do not agree with the plaintiff's narrow reading of Feinson that, in technically complex matters, expert testimony is the only acceptable substantial evidence. This position would have reduced the agency hearings to a nose count of experts. It would have made irrelevant the testimony from Warren [the conservation enforcement officer] and numerous neighbors."
As a part of this argument, the plaintiff claims that because there was no expert testimony in opposition to its application, there was no substantial evidence in the record to legally support the Commission's action. In that regard, in passing on any application an administrative agency, such as the Commission in this case, must determine the application of the law and its regulations to a specific set of facts. Once it has done so, on appeal, the court must judge whether the decision reached by the Commission was unreasonable, arbitrary or illegal. Casertav. Zoning Board of Appeals, 28 Conn. App. 256, 258, 610 A.2d 713 (1992). Specifically, it is the court's obligation to sustain the Commission's decision is an examination of the record discloses evidence, which supports any of the reasons given for its decision. Samperi v. InlandWetlands Agency, 226 Conn. 579, 587-588, 628 A.2d 1286 (1993).
The court in Huck v. Inland Wetlands Agency, supra, defines the meaning of the term "substantial evidence" in these circumstances. The court noted at page 541 that:
"This so-called substantial evidence rule is similar to the `sufficiency of the evidence' standard applied in the traditional review of jury verdict, and evidence is sufficient to sustain an agency finding if it affords a `substantial basis in fact from which the fact in issue can reasonably be inferred. . . .' The `substantial evidence' rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. . . . [It] imposes an important limitation on the power of courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of `weight of CT Page 10224 the evidence' or `clearly erroneous' action. . . ." (Internal citations omitted.)
2. Evidence Contained in the Record
In reviewing the evidence in the record, the court notes at the outset that the property in question is a sensitive and unusual site, in that it sits at the end of a large and important wetlands resource for the Town of Old Saybrook. There are a dwindling number of such resources in the Town and in the area in general. The unique character of the wetlands is an issue that runs through the considerations in this matter. The Commission was aware of the importance of this issue when on July 17, 1998, it unanimously found that "this is a significant activity since the large amount of impervious area proposed may have a significant impact on the wetland area."[15] Mr. Cole, Chairman of the Commission stated at the hearing on November 19, 1999; "So what we have is a very valuable noteworthy wetland in the Town of Old Saybrook. Fortunately or unfortunately, it's next to this piece of property and next to a lot of other pieces of property."[16]
As noted by the defendant commission in its brief:
 "it is obvious that this type of facility is designed to attract large numbers of commercial customers during extended business opening hours and, year round. Not only does this constitute a proposed commercial use of an area substantially within the 100 foot regulated area, it is a highly intensive business use which obviously would generate, through the activities of customers, employees and their vehicles, a high potential for adverse impact on the surrounding wetlands."[17]
The implications of the proposed development for the wetlands are plain for all to comprehend. Indeed, in its discussions, the commission members note that the reason for the increase from fifty (50) to one hundred (100) feet was a desire to keep intensive business activity away from the regulated area.
Members of the public also spoke in opposition to the application. One noted that this activity would have a high adverse impact to the onsite wetlands area. Another member indicated that unfiltered pollutants would enter the area. This was the "extreme" case to watch out for because of products washing right in to the environment.[18] Others spoke about the volume of cars, the effect of the considerable paved areas and the chemicals and oils that would be spilled onto the pavement and with CT Page 10225 rain, would wash out into the wetlands area. Yet others spoke of concerns for the fauna and flora.
It is undisputed that this activity will place an additional load on the wetlands. While the expert concludes that it will not be adverse, there is, as pointed out by the defendant Commissioner of Environmental Protection, a logical inconsistency in this assertion. The expert noted that the wetlands have the ability to absorb and clean pollutants from the environment, in effect to renovate them. Nonetheless, the proposed activity will allow additional pollutants to be discharged into this important wetlands resource. The entire purpose of a wetlands agency in permitting an activity is to protect the natural resources involved. The Commission, as well as the court, was and is able to draw a different conclusion from the expert testimony and report. That conclusion is that this use affects the wetlands by placing additional burdens on a scarce resource. While it may be that the wetlands at present can accommodate it, ultimately it is a degradation of the wetlands system.
In addition to its other obligations, it is the burden of the plaintiff to show that the record does not support the action of the agency.Samperi v. Inland Wetlands Agency, supra, page 587. The court concludes, as noted above in detail, that there is substantial evidence in the record to support the agency's decision. The Commission was not bound by the expert's stated conclusions, but was justified in drawing different conclusions from the record before it. In addition, the Commission at various times during the lengthy and thorough public hearing made its concerns known on the record. The court further finds that the plaintiff has not met its burden to show that no substantial evidence exists to support the Commission's action.
(B) Consideration of Future Potential Development
The plaintiff claims that the Commission's concern about potential future development in the area was misplaced and that such concern as a reason for denial of the permit is not legally permitted. Specifically, the record shows that the Commission chairman made reference to a "potential subdivision that comes off Bokum Road, which some day the drainage will . . . dump into this wetland . . . and there is going to be drainage coming across Brendan Road and adding to what's there right now and dumping into a very noteworthy wetland."[19]
The plaintiff claims that future prospective development in the vicinity is entirely speculative and this aspect of the Commission's decision was not based on the record. The court does not find this argument persuasive. The Commission has adopted wetlands regulations in accordance with State law.[20] The Regulations Section 10-2 subsections CT Page 10226 (a) through (e) track the statute and set forth detailed criteria, which necessitate the consideration of other proposed development. Such considerations include "the irreversible and irretrievable loss of wetland . . . . resources . . . ., including the extent to which such activity would foreclose a future ability to protect, enhance or restore such resources." The Commission is certainly entitled to take into account other development projects pending within the Town. The Commission would not be able to protect the wetlands resources of the Town by myopically focusing one at a time on each isolated application before it, without considering others it has recently considered or will consider. The statutes and the regulations indicate otherwise and the court so finds.
(C) No prudent or feasible alternative to the proposed development.
The plaintiff next argues that the Commission made no written finding about whether or not there is a prudent or feasible alternative to the plaintiff's proposal. Further, it claims the Commission did not deny the application on the ground that such an alternative exists. Connecticut General Statutes 22a-41 (b)(1) provides that when an application has
 "received a public hearing or when there has been a finding by the agency that the proposed activity may have a significant impact on wetlands . . ., a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist . . . The finding and the reasons therefore shall be stated on the record in writing." (emphasis added).
In Samperi, supra, the court considered the requirements of Connecticut General Statutes § 22a-41 (b) as it then existed. The court determined that the agency's decision to approve a permit after conducting a thorough hearing and deliberations, constituted an implicit finding that there were no other feasible and prudent alternatives to the approved proposal. The court stated that while "the agency may manifest its finding explicitly, in those cases in which its finding is implicit in its decision, the reviewing court has the responsibility to search the record for substantial evidence in support of the agency's action."
A review of the record of the proceedings from this optic demonstrates that the Commission considered the issue.[21] Indeed, it requested that the applicant consider scaling down its proposal to less intrusive development by eliminating the drive-up window and the necessary additional ten parking spaces. It is specifically the addition of the drive-up window which necessitates the additional paved parking spaces to the rear of the building which intrude into the one (100) foot zone and CT Page 10227 which so concerns those opposing the application and the Commission. The applicant claimed that removing the window would be a change of use,[22]
and did not alter the plan. The court concludes that implicit in the record is the Commission's conclusion that there is a feasible and prudent alternative to the plaintiff's plan. The court therefore finds the plaintiff's claim without merit on this issue.
While not directly briefed by the parties, but implicit in the plaintiff's claim, is the question of the legal significance of the Commission's failure to make this decision is writing. In 1996, the applicable statute was amended to add that the finding be made in writing. Does Connecticut General Statutes § 22a-41(b), as amended by P.A. 96-157, no longer allow for an "implicit" finding, but instead require a remand when the agency has not made an explicit written finding? A review of the legislative history of PA. 96-157 reveals no discussion on the changes to Connecticut General Statutes § 22a-41
(b)(1).
The court must therefore consider and determine whether the statutory provision is mandatory and therefor requires a remand to the Commission to make the necessary written finding. If the provision is not mandatory, then it would be directive and an "implicit" finding, if it exists on the record, would be adequate. Our case law has defined the search for this distinction as follows:
"In order to determine whether a statute's provisions are mandatory we have traditionally looked beyond the use of the word "shall' and examined the statute's essential purpose . . . The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience . . . If it is a matter of substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words . . . A statutory provision of this type directs what is to be done but does not invalidate any action taken for failure to comply . . . Furthermore, if there is no language that expressly invalidates any action taken after noncompliance with the statutory provisions, the statute should be construed as CT Page 10228 directory." (Citations omitted; internal quotation marks omitted.) State v. Trahan, 45 Conn. App. 722, 730-31, 697 A.2d 1153, cert. denied, 243 Conn. 924, 701 A.2d 660 (1997): see also, Caron v. Inland Wetlands Watercourses Commission, 222 Conn. 269, 273, 610 A.2d 584 (1992).
The court notes that the statute does not invalidate a commission's action if it fails to make its findings in writing. Further, the "essence of the thing to be accomplished" is the Commission's consideration and determination of the issue of whether "a feasible and prudent alternative" exists, not setting it down in writing. The court concludes that the requirement of a writing is a matter of convenience and to secure order, not a central consideration. Therefore, the court concludes that while P.A. 96-157 added the words "in writing" to Connecticut General Statutes 22a-41 (b)(1), the requirement of a writing is directive only. The Commission's failure to comply does not mandate that the court sustain the appeal and remand this matter to the Commission for new deliberations. The court further concludes, that while it would have been desirable for the Commission to have made its findings explicit by setting them down in writing, the record does demonstrate a more than adequate basis for its action.
In addition, the statutory language concerning the Commission's obligation to make written findings on this issue is framed in the negative. The directive is that the Commission may not grant any permit in which it has either (1) held a public hearing or (2) found that the activity may have a significant impact on the wetlands. In other words, it would be legal error for the Commission to have granted the permit without finding that there was no alternative, the opposite of what took place in this instance. From this, the court concludes that it was the plaintiff's burden to demonstrate to the Commission that no feasible and prudent alternative to their present plan exists. This it failed to do.
For the all of the above stated reasons, the court concludes that the Commission's failure to specify in writing its conclusion that there is feasible and prudent alternative to the present plan is not legally fatal to its denial of the application. Its failure does not require the court to remand this matter to the Commission for further consideration.
In summary, the court concludes that there is substantial evidence in the record to support the Commission's conclusions in this case. It was not bound by the conclusions of the plaintiff's expert about the impact on the wetlands. It was permissible for it to consider other pending development in the Town, which might have a future impact upon the wetlands. The Commission was not required to explicitly find in writing CT Page 10229 that there was a feasible and prudent alternative to the plaintiff's plan. For all the foregoing reasons, the court dismisses the plaintiff's appeal and sustains the actions of the Commission.
Barbara M. Quinn, Judge